IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JAYME J. OVERSTREET, <br><br> Plaintiff, <br><br> vs. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | CASE NO. 1:21-cv-2062 <br><br> DISTRICT JUDGE <br> JOHN R. ADAMS <br><br> MAGISTRATE JUDGE <br> JAMES E. GRIMES JR. <br><br> **REPORT &** <br> **RECOMMENDATION** |

Plaintiff Jayme J. Overstreet filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In July 2019, Overstreet filed an application for Disability Insurance Benefits alleging a disability onset date of April 22, 2017, and claiming she was disabled due to arthritis, chronic pain, depression, and bipolar.[1] Tr. 142, 166.

---

[1]    "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

The Social Security Administration denied Overstreet's application and her motion for reconsideration. Tr. 74, 91. Overstreet then requested a hearing before an Administrative Law Judge (ALJ). Tr. 101.

In September 2020, an ALJ held a hearing. Overstreet and a vocational expert testified. Tr. 35-61. In November 2020, the ALJ issued a written decision finding that Overstreet was not disabled. Tr. 15-29. The ALJ's decision became final on September 23, 2021, when the Social Security Appeals Council declined further review. Tr. 1-3; *see* 20 C.F.R. § 404.981.

Overstreet filed this action on November 1, 2021. Doc. No. 1. She asserts the following assignment of error:

> 1. The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.
>
> 2. The ALJ erred at Step Two of the Sequential Evaluation when he failed to consider Overstreet's headaches as a severe impairment.
>
> 3. The ALJ erred when he failed to properly consider Overstreet's degenerative ankle arthritis and other impairments when forming his RFC finding that she could perform work at the light level of exertion.
>
> 4. The ALJ erred when he failed to find that the waxing and waning of Overstreet's psychological symptoms would preclude her from engaging in substantial gainful activity on a full-time and sustained basis.

Doc. 9, at 1.

**Evidence**

*1.    Personal and vocational evidence*

Overstreet was born in 1971 and was 55 years old on the alleged disability onset date. Tr. 28. She graduated from high school and used to work as a machine operator and inspector. Tr. 42, 44, 57.

*2.    Medical evidence[2]*

*Physical:*    Overstreet has a history of bilateral ankle pain. In February 2017, Overstreet saw an orthopedic doctor. Tr. 450. Overstreet's exam showed right ankle swelling. Tr. 450. The doctor reviewed Overstreet's x-rays, assessed osteoarthritis in Overstreet's ankle and in her subtalar joint, and gave her a cortisone injection in her left subtalar joint. Tr. 450.

In April 2017, Overstreet saw her primary care physician, Ralph May, M.D. Tr. 395. Overstreet reported that she has bad migraines 3-5 times a month and chronic headaches every day. Tr. 395. Overstreet said that she used to see a doctor for her migraines "a number of years" ago and she wanted to see a new doctor. Tr. 395. Dr. May assessed "intractable migraine with aura with status migrainosus," primary osteoarthritis involving multiple joints, and moderate episode of recurrent major depressive disorder. Tr. 396.

---

[2]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

Almost two years later, in February 2019, Overstreet saw Dr. May for chronic ankle pain. Tr. 375. Dr. May's exam found edema in Overstreet's ankles and referred Overstreet to podiatrist Marc Dolce, DPM. Tr. 376.

In March 2019, Overstreet saw Dr. Dolce at Northern Ohio Foot & Ankle Specialists. Tr. 322. Overstreet reported severe pain in both ankles and difficulty walking at times, which was worse on her left ankle. Tr. 322. Overstreet said that she had been injured by a horse "years ago on the left side." Tr. 322. Overstreet was obese and had trouble losing weight because of her ankle pain. Tr. 322. An ultrasound showed "hypoechoic capsulitis and bilateral subtalar joints. Secondary to severe degenerative arthritis." Tr. 327. Overstreet had moderate degenerative arthritis in her right ankle and severe degenerative arthritis in her left. Tr. 327. Dr. Dolce recommended "conservative therapy"—joint injections, a molded orthotic, and weight loss. Tr. 327.

Overstreet was making "significant progress" until she tripped, fell, and injured her left ankle in April 2019. Tr. 339.

In June 2019, Overstreet saw Dr. Dolce and reported that she had not improved since her fall in April. Tr. 352. Overstreet also reported "significant lateral ankle instability" and said that her recent fall was "related to instability of her ankle." Tr. 352. A left ankle exam showed mild crepitus and pain with range of motion, pain with palpation, and significant hypermobility. Tr. 352. A left ankle MRI showed scarring of the anterior talofibular and

4

calcaneofibular ligaments, "apparent talar tilt with resultant bone marrow edema and subcortical cyst formation within the distal fibula," and mild bone marrow edema within the subjacent calcaneus. Tr. 363. In July, Dr. Dolce recommended surgery. Tr. 363. Overstreet had left ankle surgery in early August 1, 2019. Tr. 456-460.

A week later, Overstreet had a follow-up visit with Dr. Dolce. Tr. 485. Dr. Dolce wrote that Overstreet was "noncompliant with weightbearing status"—she was not using crutches and walked on her foot against medical advice. Tr. 487. At her 2-week post-op visit, Dr. Dolce commented that Overstreet was noncompliant with her antibiotics, taking 3 per day instead of 4. Tr. 491. Overstreet was also noncompliant with her weightbearing status— she was wearing a surgical shoe instead of her walking boot. Tr. 491. Three weeks post-op, Overstreet was doing "much better." Tr. 494. Overstreet's ankle was mildly tender and the swelling had improved. Tr. 494.

In September 2019, at Overstreet's 6-week post-op visit, Overstreet told Dr. Dolce that she still had pain around her left ankle. Tr. 496. Dr. Dolce found that Overstreet had full range of motion with no crepitus and significant improvement in her ankle stability. Tr. 497. Dr. Dolce discussed physical therapy, which Overstreet "did not feel is necessary at this point." Tr. 497.

In October 2019, Overstreet saw Dr. Dolce for her 12-week, post-op visit. Tr. 498. Overstreet reported consistent pain with walking. Tr. 500. Dr. Dolce observed that Overstreet was wearing flip-flops. Tr. 500. Dr. Dolce told

Overstreet that she needs to wear "continued structured shoes" and her ankle stabilizer boot or her pneumatic walking boot. Tr. 500.

In November 2019, Dr. May completed a disability questionnaire on Overstreet's behalf. Tr. 540-541. Dr. May listed Overstreet's diagnoses: "chronic migraines/depression" and chronic pain syndrome due to primary osteoarthritis and left ankle instability. Tr. 540. Dr. May wrote that Overstreet's chronic pain and depression were manageable with medication. Tr. 541. When asked to describe Overstreet's limitations from her impairments, Dr. May wrote that Overstreet has "episodic severe migraine headaches where she is unable to work" and "chronic pain/[osteoarthritis] with [left] ankle instability where her ambulation is limited." Tr. 541.

In January 2020, Overstreet had a pre-op visit for bariatric surgery. Tr. 581. An examiner found no swelling or pain in Overstreet's extremities. Tr. 582. Overstreet had bariatric surgery in February 2020. Tr. 565. By August 2020, Overstreet had lost 71 pounds. Tr. 553.

*Mental*:     In October 2016, Overstreet saw Upender Gehlot, M.D., for mental health treatment. Tr. 248. Overstreet reported that she was working a lot and "doing okay." Tr. 248. She had more "fair" days, some irritability, and was less distracted. Tr. 248. Overstreet's mental status exam showed that she had a "constricted/restricted" affect, an "okay" mood, and was otherwise normal. Tr. 249. Dr. Gehlot assessed bipolar disorder, type I, and panic

6

disorder with agoraphobia. Tr. 250. He continued Overstreet's medications. Tr. 250.

In May 2017, Overstreet saw Dr. Gehlot. Tr. 309. Overstreet reported that she was let go from her job and planned to file for unemployment. Tr. 309. Overstreet said that she felt better and coped better. Tr. 309. Overstreet's mental status exam showed that she had a "less labile" affect, a "less depressed" mood, and was otherwise normal. Tr. 310.

In July 2017, Overstreet told Dr. Gehlot that she was feeling better and that her medications were helping. Tr. 304. Overstreet was looking for work and receiving unemployment. Tr. 304. She experienced increased situational stress and anxiety but denied sadness and irritability. Tr. 304. An exam showed that Overstreet had a mildly anxious affect and her mood was "stressed." Tr. 305.

In September 2017, Overstreet told Dr. Gehlot that she was feeling better. Tr. 299. Dr. Gehlot observed that Overstreet had an improved mood and improved medication compliance with no side effects. Tr. 299.

In December 2017, Overstreet saw Dr. Gehlot and stated that she was caring for her sick mother and was no longer on unemployment benefits. Tr. 294. Overstreet's mood and emotions were not as good due to "situational stress." Tr. 294

Almost a year later, in October 2018, Overstreet returned to Dr. Gehlot. Tr. 289. Overstreet reported that she had stopped her medications because she

7

"wanted '[her] body to rest' and get rid of all medications. It has not 'worked out well.'" Tr. 289. Overstreet was irritable, had problems sleeping, her mind was racing, and she complained of headaches. Tr. 289. Dr. Gehlot restarted Overstreet's medications. Tr. 289.

Two weeks later, Overstreet told Dr. Gehlot that she "can already see the benefit of medications ... 'I feel a lot better already.'" Tr. 284. Overstreet had improved mood and focus and less anxiety. Tr. 284.

In November 2018, Overstreet saw Dr. Gehlot and said that she had not been doing well for the last week or so. Tr. 279. Dr. Gehlot commented that Overstreet was hyperverbal and argumentative. Tr. 279. Overstreet said that she was investigating paranormal activities. Tr. 279. Overstreet's mental status exam showed good hygiene, psychomotor agitation, less than cooperative attitude, pressured speech, and "flight of ideas." Tr. 280. Overstreet had no hallucination, paranoia, delusions, or phobias. Tr. 280. Her affect was labile and her mood was irritable. Tr. 280. Dr. Gehlot adjusted Overstreet's medications. Tr. 282.

In January 2019, Overstreet saw Dr. Gehlot and was doing better—her speech, mood, sleep, and anxiety had improved. Tr. 274. Overstreet's mental status exam showed a restricted affect but was otherwise unremarkable. Tr. 275. In April, Overstreet told Dr. Gehlot that her mood and anxiety were improved. Tr. 269. She denied depressive symptoms and said that her anxiety was controlled. Tr. 269. Overstreet's mental status exam was normal. Tr. 270.

In July 2019, Overstreet saw Dr. Gehlot for her 3-month, medication management appointment. Tr. 314. Overstreet said that she felt fairly stable—she was mildly irritable the last few days "but nothing she can't manage." Tr. 314. Overstreet's mental status exam showed restlessness, mildly pressured speech, and a mildly labile affect. Tr. 315. Overstreet was cooperative and alert, her mood was "okay," her insight was improved, and her intellect and fund of knowledge were within normal limits. Tr. 315-316.

In August 2019, Overstreet saw Kimberly Harrison, LPCC, at Cornerstone Counseling. Tr. 547. Overstreet saw Harrison to process recent stressors, including her recent ankle surgery, planned bariatric surgery, and the anniversary of her mother's death. Tr. 547. Later that month, Overstreet saw Harrison and they discussed Overstreet's grieving process. Tr. 546. Overstreet reported that she felt more depressed lately and had difficulty getting out of bed. Tr. 546. She felt unsure of her future. Tr. 546. That day, Harrison completed a questionnaire for Overstreet's disability application. Tr. 477. Harrison wrote that "social anxiety makes shopping a challenge" for Overstreet but that Overstreet did not need any assistance. Tr. 477.

In October 2019, Overstreet saw Dr. Gehlot for a follow-up. Tr. 504. Overstreet reported increased depressive symptoms and difficulty sleeping. Tr. 504. She said, "my meds were working for a while." Tr. 504. Overstreet reported not leaving home because of increased anxiety. Tr. 504. Overstreet's mental status exam showed a labile affect and depressed mood, but she had

9

normal behavior, appearance, speech, thoughts, attention, memory, and concentration. Tr. 505. Dr. Gehlot adjusted Overstreet's medications. Tr. 506.

In November 2019, Overstreet saw Dr. Gehlot for a follow-up. Tr. 508. Dr. Gehlot wrote that Overstreet "entered the room [and] stated that she wants to try lithium." Tr. 508. Overstreet reported feeling unstable, depressed, anxious, and having difficulty sleeping. Tr. 508. Upon exam, Overstreet was hyperverbal and irritable. Tr. 509. She was alert, oriented, appropriately dressed and groomed, and cooperative. Tr. 509. Overstreet had fair insight and judgment and an adequate fund of knowledge. Tr. 509. Dr. Gehlot prescribed Lithium. Tr. 510.

In December 2019, Overstreet saw Harrison for a counseling appointment. Tr. 545. Overstreet told Harrison that she was "still having a lot of physical pain" and that she was "struggling to find work due to her inability to stand/sit for long periods of time." Tr. 545.

3.      *State agency opinions*[3]

*Physical*:      In September 2019, Rohini Mendonca, M.D., reviewed Overstreet's record and assessed her physical residual functional capacity (RFC).[4] Dr. Mendonca found that Overstreet could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds; stand or walk for 6 hours in an 8-hour workday; and sit for 6 hours in an 8-hour workday. Tr. 69. Overstreet could frequently climb ramps and stairs but never ladders, ropes, or scaffolds. Tr. 69.

In December 2019, Leslie Green, M.D., reviewed Overstreet's record and adopted Dr. Mendonca's opinion, but added additional restrictions. Dr. Green found that Overstreet could frequently stoop, kneel, crouch, and crawl. Tr. 85. Overstreet must avoid concentrated exposure to extreme cold and heat; humidity; noise; vibration; fumes, dusts, gases, and poor ventilation; and certain hazards. Tr. 85-86.

---

[3]      When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[4]      An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

*Mental*:    In September 2019, Courtney Zeune, Psy.D., reviewed Overstreet's record and assessed her mental RFC. Dr. Zeune wrote that Overstreet should not work directly with the public and may have difficulty getting along with coworkers. Tr. 71. In December 2019, Kristen Haskins, Psy.D., reviewed Overstreet's record and adopted Dr. Zeune's opinion. Tr. 87-88.

### 4.    Hearing testimony

Overstreet, who was represented by counsel, testified at the administrative hearing held by telephone in September 2020. Overstreet stated that she lives in a house by herself. Tr. 43. She works as a caregiver part time. Tr. 43. She has a "couple clients" she sees "for a couple hours at a time." Tr. 43. Overstreet estimated that she worked about 20 hours a week. Tr. 43. She drives to her clients' homes; "they don't live very far from me." Tr. 50.

Overstreet said that she can only work part time because she has "a lot of bad days." Tr. 43. When asked about her bad days, Overstreet explained that a "bad day" is when she doesn't want to get out of bed. Tr. 45. She gets out of bed only because she has 3 dogs—without them, she "probably would just stay in bed all day." Tr. 45. And she does not have contact with anybody. Tr. 45.

Overstreet stated that when her ankle hurts, the pain makes her depression worse. Tr. 49. Overstreet's cousin has a key to Overstreet's house and comes to check on Overstreet to make sure she's "up and around" and eating. Tr. 46. When asked how often she has bad days, Overstreet answered

that she has "quite a few" and stated, "today is not a good day. I don't plan on leaving the house at all." Tr. 46. She may have 2 good days a week. Tr. 46. When asked if she has any problems working on a good day, Overstreet said that she enjoys seeing her clients and is "able … to do what I have to do to help them." Tr. 46.

When asked how her ankle "was doing," Overstreet said that her ankle was "really bad." Tr. 47. She lost 80 pounds, hoping that weight loss would improve her ankle, but her ankle was worse. Tr. 47. Overstreet had not been back to the podiatrist because "I don't know what he could do." Tr. 47. The podiatrist made "braces" for her ankle but "it doesn't help at all." Tr. 47. Surgery also did not help. Tr. 47. When asked how her ankle problem interfered with her work as a caregiver, Overstreet said that she takes her shoes off at one place, which "kind of helps some." Tr. 47. At another place she doesn't have to be on her feet all the time, "only when I have to help my client to the bathroom or something like that." Tr. 47-48. When asked what further treatment her doctor recommended, Overstreet said her doctor told her that "maybe we could try another type of surgery," but Overstreet said that the ankle surgery she had before "was the worst surgery I've ever had." Tr. 48.

Overstreet takes medication for her mental health symptoms. Tr. 49. Overstreet's medications help; "I guess they make me somewhat stable." Tr. 49. Overstreet also listens to calming music and meditates. Tr. 49. On good days, Overstreet can keep up with things around the house like cleaning and

13

laundry. Tr. 50. She takes advantage of her good days to accomplish tasks, like mowing the grass and bathing her dogs. Tr. 50. Overstreet's cousin helps run errands for her. Tr. 51. Overstreet can go to the store by herself, though it's a struggle and she takes an anxiety pill before she goes. Tr. 52.

Overstreet stated that she has problems focusing. Tr. 53. When she reads, she re-reads sentences but the words don't register. Tr. 53. On a "halfway decent day," Overstreet's mind is "okay." Tr. 54. She will start many things but she only finishes one thing. Tr. 54. That problem doesn't interfere with her job as a caregiver because she works for about 4 hours at a time and she stays focused on her clients. Tr. 54-55.

The ALJ discussed with the vocational expert Overstreet's past relevant work as a machine operator and inspector. Tr. 57. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same work experience as Overstreet could perform Overstreet's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 57-58. The vocational expert answered that such an individual could not perform Overstreet's past work but could perform the following jobs: merchandise maker, mailing clerk, and electronic worker. Tr. 58.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.      The claimant has not engaged in substantial gainful activity since April 22, 2017, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.      The claimant has the following severe impairments: osteoarthritis of the left lower extremity; obesity; depressive disorder; and anxiety disorder (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, or crawl; must avoid concentrated exposure to extreme cold, extreme heat, humidity, noise, vibration, and fumes, odors, dust, gases, and poor ventilation; must avoid concentrated exposure to hazards such as unprotected heights, moving machinery, and commercial driving; can understand, remember, and carry out simple instructions in a routine work setting; can respond appropriately to supervisors, coworkers, and work situations if the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born [i]n 1971 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

15

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 22, 2017, through the date of this decision (20 CFR 404.1520(g)).

Tr. 17–29.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.     Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.     Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.     Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

16

4.      What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.      Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if

17

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

*1.     Overstreet is not entitled to relief based on her separation of powers argument*

Overstreet first argues that because the SSA's former commissioner's tenure protection was unconstitutional, she is entitled to a new administrative hearing.[5] Doc. 9, at 9–13. Defendant concedes that Commissioner Saul's tenure

---

[5]     Defendant does not challenge Overstreet's standing to bring this claim. Given *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2195–96 (2020), Overstreet has standing to raise this issue. *See Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021) ("As we have explained on many prior occasions, the separation of powers is designed to preserve the liberty of all the people. So whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.") (citations omitted). I reject, however, Overstreet's assertion that she has standing *because* Defendant hasn't challenged her standing. Doc. 11, at 3.

protection, *see* 42 U.S.C. § 902(a)(3), "violate[d] the separation of powers," but denies that the violation warrants a new hearing. I agree with Defendant.

The SSA is headed by a single commissioner who, by statute, may only be removed from office on a presidential "finding … of neglect of duty or malfeasance in office." 42 U.S.C. § 902(a)(3). In *Seila Law*, the Supreme Court held that the Constitution's separation of powers prohibits Congress from fashioning a single-member, independent agency whose head is removable only for "inefficiency, neglect of duty, or malfeasance in office." 140 S. Ct. at 2197-2207. When confronted with a similarly structured agency, headed by a single director who could only be removed for cause, the Court in *Collins v. Yellen*, found it itself bound by *Seila Law* and held that the director's for cause removal protection violated the Constitution. 121 S. Ct. 1761, 1784 (2021).

The Court in *Collins* then considered whether the respondents were entitled to any relief. The Court stressed that while the director's removal protection was unconstitutional, there was no question that his appointment was valid. *Id.* at 1787–88. As the Court put it, while the director's removal protection "unconstitutionally limited the President's authority …, there was no constitutional defect in the statutorily prescribed method of appointment to that office." *Id.* at 1787. Because this was the case, "there is no reason to regard any of the actions taken by the" agency "as void." *Id.* And these facts served to distinguish previous cases involving unconstitutional appointments as opposed to unconstitutional removal protections. *Id.* at 1788. The Court then

19

expressed doubt that the respondents could show that the director's unconstitutional removal protection caused them harm but granted the possibility that "an unconstitutional provision [could] inflict compensable harm." *Id.* at 1788–89. So the Court remanded. *Id.* at 1789.

Since the Court decided *Seila Law*, a host of social security claimants have relied on it to argue that they are entitled to new hearings. But after *Collins*, courts have repeatedly rejected these arguments, principally because the claimants have been unable to show that "the unconstitutional removal provision actually harmed" them. *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022); *see* Defendant's Br. at 6–7 n.3. As the Sixth Circuit has recognized, "*Collins* … provides a clear instruction: To invalidate an agency action due to a removal violation, that constitutional infirmity must 'cause harm' to the challenging party." *Calcutt v. Fed. Deposit Ins. Corp.*, 37 F.4th 293, 316 (6th Cir. 2022), *mandate recalled by* 2022 WL 4546340 (U.S. Sept. 29, 2022) (No. 22A255).

Overstreet, however, never leaves the starting gate on this issue; she doesn't attempt to show harm. Instead, she argues that the Commissioner's removal protections render void his actions and those of his delegates. Doc. 9, at 10–12; *see* Doc. 11, at 3–5. So she misreads *Seila Law* and ignores *Collins*'s emphasis on the fact that an unconstitutional removal provision has no bearing on the validity of an appointment or actions taken under that appointment. 141 S. Ct. at 1787–88; *see* Doc. 11, at 7 (relying on *Lucia v. SEC*, 138 S. Ct.

2044 (2018), an Appointments Clause decision). And because she hasn't tried to show actual harm, Overstreet has necessarily failed to carry her burden to show harm. *See Calcutt*, 37 F.4th at 316. And her vague claims of harm in her reply fare no better. *See* Doc. 11, at 7; *Calcutt*, 37 F.4th at 317 ("vague, generalized allegations" are not enough to satisfy *Collins*).

In her reply, Overstreet attempts to distinguish the SSA commissioner's tenure protection from the tenure protections at issue in *Collins* and *Seila*. Doc. 11 at 3–4. According to Overstreet, the protections in these latter cases "were not as limiting as" the commissioner's for-cause protection. Doc. 11, at 3–4. This is a red herring. The strength of the tenure protection at issue is irrelevant because the SSA concedes that the commissioner's for-cause protection was unconstitutional.[6] Overstreet doesn't get bonus points for showing the commissioner's tenure protection was even more unconstitutional. Moreover, Overstreet is mistaken. The tenure protection at issue here, "neglect of duty or malfeasance in office," 42 U.S.C. § 902(a)(3), is nearly the same as in *Seila*, *see* 12 U.S.C. § 5491(c)(3) (2012), and stronger than the *for cause* protection at issue in *Collins*, *see* 12 U.S.C. § 4512(b)(2); *Collins*, 141 S. Ct. at 1786 ("the Recovery Act's 'for cause" restriction appears to give the President more removal authority than other removal provisions reviewed by this Court'").

---

[6]    Overstreet cites nothing to support her argument, perhaps because Congress has never explained what "inefficiency, neglect of duty, or malfeasance in office" means. *See PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 130–37 (D.C. Cir. 2018) (Griffith, J., concurring), *abrogated by Seila Law*, 140 S. Ct. 2183.

> 2.    *The ALJ did not commit reversible error at step two*

Overstreet argues that the ALJ committed reversible error at step two because the ALJ didn't discuss Overstreet's headaches. Doc. 9, at 14. I disagree.

At step two of the sequential evaluation, the ALJ determines whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii). A *severe* impairment is one that significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). An impairment is "not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). When an ALJ finds *severe* and *non-severe* impairments at step two and continues with the subsequent steps in the sequential evaluation process, any error at step two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is harmless error when the ALJ continues through the remaining steps of the evaluation and can consider *non-severe* impairments when assessing an RFC); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) ("The fact that some of Anthony's impairments were not deemed to be severe at step two is…legally irrelevant" because the ALJ considered Anthony's *severe* and *non-severe* impairments in the remaining steps of the analysis, citing *Maziarz*); *Hedges v. Comm'r of Soc.*

*Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5).

Here, the ALJ did not discuss Overstreet's headaches at step two. Overstreet argues that the ALJ's failure to do so is reversible error because the ALJ "fail[ed] to even mention migraines/headaches … anywhere else in his decision." Doc. 9, at 14-15. But Overstreet concedes that the ALJ mentioned Overstreet's chronic migraines when the ALJ discussed Dr. May's opinion elsewhere in his decision. Doc. 9, at 14; Tr. 25. And Dr. Green, the state agency reviewing physician, found that Overstreet must avoid concentrated exposure to extreme cold and heat, humidity, noise, vibration, fumes, dusts, gases, poor ventilation, and certain hazards because those items were "possible migraine triggers." Tr. 85-86. The ALJ adopted Dr. Green's environmental restrictions and included them in his RFC assessment. Tr. 20, 25.

So even if the ALJ erred at step two when he didn't mention Overstreet's headaches or migraines,[7] any error is harmless because the ALJ continued through the remaining steps of the sequential evaluation, considered

---

[7]    Neither Overstreet nor her attorney mentioned headaches or migraines at Overstreet's administrative hearing. *See, e.g.*, Tr. 39-41 (Overstreet's attorney's opening statement identifying Overstreet's impairments but not mentioning migraines or headaches).

23

Overstreet's migraine headaches, and included a restriction in the RFC to accommodate Overstreet's migraine headaches. *See Anthony*, 266 F. App'x at 457; *Maziarz*, 837 F.2d at 244.

> 3.      *The ALJ did not err when he found that Overstreet had an RFC to perform "light work"*

Overstreet argues that the ALJ "failed to properly consider Overstreet's degenerative ankle arthritis and other impairments when forming his RFC finding that she could perform work at the light level of exertion."[8] Doc. 9, at 15. Overstreet recites her history of ankle problems and her left ankle surgery. Doc. 9, at 16-17. She recounts her testimony and her obesity. Doc. 9, at 18. Overstreet writes, "[a]fter considering all the evidence regarding her severe degenerative arthritis in both ankles and her obesity, the ALJ still incredulously found that she was capable of standing/walking six of eight hours per day." Doc. 9, at 19. Overstreet concludes, "It was harmful error for the ALJ to find that someone with the combination of Overstreet's documented ankle problems and obesity requiring bariatric surgery could perform full-time work at the light level of exertion." Doc. 9, at 19.

---

[8]      "Light Work" is "exerting up to 20 pounds of force occasionally, or up to 10 pounds of force frequently, or a negligible amount of force constantly to move objects." It requires "walking or standing to a significant degree; … sitting most of the time while pushing or pulling arm or leg controls; or … working at production rate pace while constantly pushing or pulling materials even though the weight of the materials is negligible." *See* Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, U.S. Dept. of Labor, 1993, at C-2.

Overstreet's argument fails. The ALJ considered Overstreet's hearing testimony. Tr. 20-21. The ALJ detailed Overstreet's history of osteoarthritis in her left ankle: her treatment, including surgery; her imaging and exam findings; and her repeated non-compliance with medical advice. Tr. 21-22. The ALJ considered Overstreet's obesity, alone and in connection with her left ankle impairment, and her successful bariatric surgery. Tr. 21, 22-23. The ALJ explained why he found Overstreet's statements about her symptoms not entirely consistent with the record, Tr. 24-25, 27, and the ALJ explained why he found the doctors' opinions persuasive or not persuasive. Tr. 25-26. Overstreet does not challenge any of the ALJ's findings about any of this evidence. Overstreet has not shown that the ALJ erred when he assessed an RFC finding that Overstreet could perform *light* work.[9]

---

[9]    In Overstreet's brief, in the middle of her RFC argument under the heading challenging the ALJ's RFC finding, Overstreet's counsel references Listing 1.02 and cites some medical evidence. Doc. 9, at 18. To the extent this is an attempt to challenge the ALJ's step-three determination, that attempt fails. Overstreet does not allege that the ALJ erred at step three. I decline to make her arguments for her. Also, Overstreet's counsel knows better. She is an experienced Social Security practitioner who regularly appears before this Court. Counsel has been previously warned to refrain from combining disparate challenges and arguments of the sequential disability evaluation together. *See, e.g.*, Case No. 1:21-cv-00556, Doc. 19, at 34 n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. 19, at 34 n. 5 (filed 2/2/2022); see also Case No. 5:20-cv-01340, Doc. 21, at 26 n. 9 (filed 8/16/2021); Case No. 1:20-cv-01186, Doc. 21, at 25 n. 8 (filed 8/16/2021).

4. *The ALJ did not err when he evaluated Overstreet's mental health symptoms*

Overstreet argues that the ALJ erred "when he failed to find that the waxing and waning of Overstreet's psychological symptoms would preclude her from engaging in substantial gainful activity on a full-time and sustained basis." Doc. 9, at 19. In support, Overstreet cites *Keyse v. Saul*, 2021 WL 1214691, at *20 (N.D. Ohio Mar. 31, 2021). Doc. 9, at 22.

In *Keyse*, the district court identified numerous errors in the ALJ's decision. One error was the ALJ's evaluation of the claimant's treating psychiatrist's opinion. *Keyse*, 2021 WL 1214691, at *20. The court found that the ALJ ignored the psychiatrist's assessment that the claimant's mental health symptoms "wax[ed] and wan[ed]" because the claimant stopped taking antidepressants. *Id*. The psychiatrist explained that the claimant could not tolerate antidepressants. *Id*.

Overstreet does not cite opinion evidence, or any other type of evidence, showing that she could not tolerate taking her medications. So *Keyse* does not help Overstreet here. The ALJ discussed Overstreet's mental health treatment history, including her symptoms and her medication changes. Tr. 23-24. Overstreet does not challenge the ALJ's recitation of the evidence or his conclusions.

Next, Overstreet recounts the ALJ's step-three findings for Listing 12.04, *depressive, bipolar and related disorders*, and Listing 12.06, *anxiety and obsessive-compulsive disorders*. Doc. 9, at 20. As part of the ALJ's step-three

26

analysis, the ALJ found that Overstreet had "moderate" limitations in 3 of the 4 areas of functioning found in the *paragraph B* criteria: interacting with others; concentrating, persisting or maintaining pace; and adapting or managing herself. Tr. 19. Overstreet recites some of her own hearing testimony and concludes, "This evidence, combined with the evidence as set forth above and the ALJ's acknowledged limitations, refutes the ALJ's conclusions and proves that the ALJ's conclusions regarding Overstreet's functional limitations were misstated and in error." Doc. 9, at 21. Overstreet claims that she was *seriously* limited, not *moderately* limited, in "at least two" of the *paragraph B* criteria. Doc. 9, at 21.

Overstreet does not identify what portion of the ALJ's *paragraph B* analysis she believes is wrong. She cites a few cases without explaining how, specifically, those cases are analogous to her case. Doc. 9, at 22-23. In fact, it is not clear whether Overstreet's cited cases are meant to support a step-three argument or if she has moved on to another legal theory. Overstreet makes sweeping generalizations—the ALJ "failed to consider the totality of Overstreet's physical and psychological impairments and found that she was capable of engaging in full-time and sustained work activity"—without tying her accusations to any of the ALJ's findings at any specific step in the sequential analysis. Doc. 9, at 23; *see also id*. at 24 ("the ALJ erroneously did not build an accurate and logical bridge between the evidence documenting Overstreet's disabling problems and the ALJ's decision to deny benefits.").

Overstreet thus has waived those arguments. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

Finally, on the last page of her brief under the subsection discussing the ALJ's evaluation of her mental health impairments, Overstreet argues that the ALJ erred when he evaluated Dr. May's opinion about her physical impairments. Doc. 9, at 24. Overstreet writes, "the ALJ … failed to give a coherent explanation for his reasoning" and "offered an inadequate analysis." Doc. 9, at 24. Overstreet is mistaken. The ALJ thoroughly explained why he discounted Dr. May's opinion. Tr. 25-26. Overstreet does not identify what portion of that explanation she wishes to challenge. Her last-ditch attempt in her reply brief is contradictory and fares no better.[10] Doc. 11, at 2. Overstreet's argument is waived. *McPherson*, 125 F.3d at 995–96.

---

[10]    In her reply brief, Overstreet claims that the ALJ did not consider whether Dr. May's opinion was consistent with the record but also concedes that the ALJ stated that Dr. May's opinion was not consistent with the record. Doc. 11, at 2.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: October 7, 2022

/s/ James E. Grimes Jr.

James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).